UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD SHINNERS, | : | CASE NO. _____ |
| PERSONAL REPRESENTATIVE OF | : | |
| THE ESTATE OF DAVID ALAN GARCEAU, | : | JUDGE_____ |
| DECEASED | : | |
| HAMMOND AND SHINNERS, PC | : | COMPLAINT |
| 7730 Carondelet Ave., Suite 200 | : | (CLAIMS BROUGHT PURSUANT |
| St. Louis MO 63105 | : | TO 42 U.S.C. § 1983 AND |
| | : | MISSOURI STATE LAW) |
| and | : | |
| | : | |
| NATHAN GARCEAU | : | |
| 33659 Gloria Avenue | : | |
| North Ridgeville, Ohio 44039 | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| GEORGE LOMBARDI, Former Director | : | |
| Of The Missouri Department of Corrections | : | |
| In His Individual Capacity | : | |
| Service c/o Katherine S. Walsh | : | |
| Assistant Attorney General | : | |
| PO Box 861 | : | |
| St. Louis, MO 63188, | : | |
| | : | |
| JOHN YOUNG, Former Superintendent of the | : | |
| St. Louis Community Release Center, | : | |
| In His Individual Capacity | : | |
| Service c/o Katherine S. Walsh | : | |
| Assistant Attorney General | : | |
| PO Box 861 | : | |
| St. Louis, MO 63188, | : | |
| | : | |
| JOSEPH SAMPSON, Former Assistant | : | |
| Superintendent of the Superintendent of the | : | |
| St. Louis Community Release Center, | : | |
| In His Individual Capacity | : | |
| Service c/o Katherine S. Walsh | : | |
| Assistant Attorney General | : | |
| PO Box 861 | : | |
| St. Louis, MO 63188, | : | |

1

ANTONIO GRAY, Former Or Current    :
Employee of the St. Louis Community    :
Release Center, In His Individual Capacity    :
Service c/o Katherine S. Walsh    :
Assistant Attorney General    :
PO Box 861    :
St. Louis, MO 63188,    :
   :
TASHA KUPIHEA, Former Or Current    :
Employee of the St. Louis Community    :
Release Center, In Her Individual Capacity    :
Service c/o Katherine S. Walsh    :
Assistant Attorney General    :
PO Box 861    :
St. Louis, MO 63188,    :
   :
LeRONALD LOPER, Former Or Current    :
Employee of the St. Louis Community    :
Release Center, In His Individual Capacity    :
Service c/o Katherine S. Walsh    :
Assistant Attorney General    :
PO Box 861    :
St. Louis, MO 63188,    :
   :
FREDDIE HOLLOWAY, Former Or Current    :
Employee of the St. Louis Community    :
Release Center, In His Individual Capacity    :
Service c/o Katherine S. Walsh    :
Assistant Attorney General    :
PO Box 861    :
St. Louis, MO 63188,    :
   :
SAMANTHA STANFIELD, Former    :
Or Current Employee of the St. Louis    :
Community Release Center, In Her Individual    :
Capacity    :
Service c/o Katherine S. Walsh    :
Assistant Attorney General    :
PO Box 861    :
St. Louis, MO 63188    :
   :
      and    :

| | |
|---|---|
| JANE/JOHN DOES 1-10, Former Or Current | : |
| Employees of the St. Louis Community Release | : |
| Center Whose Names Are Presently Unknown | : |
| and Cannot Be Ascertained By Due Diligence, | : |
| In Their Individual Capacities | : |
| Service at Missouri Department of Corrections | : |
| 2729 Plaza Drive | : |
| Jefferson City, MO 65102 and at St. Louis | : |
| Community Release Center, 1621 N. 1st St. | : |
| St. Louis, MO 63102, | : |
| | : |
| Defendants. | : |

## I.   <u>INTRODUCTION</u>

1.      In October 2016 David Alan Garceau ("Garceau") was a 41 year-old father, son and brother, and he was suffering from post-traumatic stress disorder ("PTSD"), schizoaffective disorder, depression and suicidal ideation. At that time, Garceau was a parolee of the State of Missouri ("State" or "Missouri").

2.      On October 9, 2016, Garceau made an unsuccessful attempt to commit suicide.

3.      After his unsuccessful October 9, 2016 suicide attempt, Garceau's mother and sister welcomed him to live with them in Ohio.  However, Garceau was required to reside in Missouri until his parole ended.

4.      In October 2016 Garceau was being treated at Burrell Behavioral Health ("BBH") for his serious mental illnesses.  On October 12, 2016, a BBH staff member told Garceau's parole officer that Garceau should not be placed in "a homeless shelter [and that] similar housing options were not good option[s] [for Garceau] because it appear[ed] that [he was] a danger to himself and others."

5.      Garceau's parole officer was so concerned about Garceau's safety and health needs that she stated that she would do what was necessary, including violating Garceau's parole, to see

that Garceau was placed in a facility where he would receive the counseling and treatment that he needed.

6. In October 2016 and for several years prior to October 2016, the St. Louis Community Release Center ("the Center") was owned, operated, funded and staffed by the State.

7. In October 2016:

- the Center had no medical staff on site;
- the Center had no mental health staff on site;
- prior to their acceptance at the Center, the Center did not conduct comprehensive mental health assessments of individuals with a history of suicide attempts;
- the Center's procedures and policies for screening, evaluating and protecting individuals in need of mental health treatment were non-existent or grossly inadequate;
- the Center's procedures and policies for screening, evaluating and protecting individuals particularly vulnerable to suicide were non-existent or grossly inadequate;
- the Center's procedures and policies for the intake and inventory of prescription medications were grossly inadequate
- the Center's procedures and policies for administering medications prescribed for individuals were grossly inadequate;
- none of the individuals housed at the Center who had serious mental health needs received any counseling for those needs;
- the Center's procedures and policies for the removal of dangerous items from cells occupied by individuals who were particularly vulnerable to suicide were non-existent or grossly inadequate;
- the Center had no cells that were properly designed and constructed in order to protect individuals who were particularly vulnerable to suicide;
- the Center had no cells that were properly furnished to protect individuals who were particularly vulnerable to suicide; and
- the Center's personnel received no or grossly inadequate training on how to properly respond to and protect individuals who were particularly vulnerable to suicide.

8. In addition to the problems and conditions set forth in paragraph 7 above, in October 2016 the Center was experiencing the following serious problems and conditions:

- significant understaffing;
- inadequate or no training of staff;
- vague post orders;

4

- inadequate or no supervision of staff;
- pervasive use by staff of computers and cell phones for personal reasons at times when staff were required to do security checks or watch video surveillance of cells;
- pervasive falsification of chronology logs to reflect security checks that were not conducted;
- pervasive failure to properly conduct security checks in direct violation of the Center's policies and procedures;
- pervasive failure to dispense medication in direct violation of the Center's policies and procedures;
- inadequate or no lighting in cells in the Center's Administrative Segregation Unit ("the Ad Seg Unit");
- pervasive failure to take disciplinary action against staff who failed to perform their duties, falsified chronology logs, and/or violated the Missouri Department of Correction's ("DOC") and the Center's policies and procedures; and
- significant overcrowding.

9.      According to Defendant Samantha Stanfield, in October 2016 the Center was a "wasteland" where its residents "were treated like dirt."

10.     According to Kenneth C. Jones, the Chairman of Missouri's Bureau of Probation and Parole ("BPP"), in October 2016 the Center was the equivalent of a homeless shelter.

11.     For years prior to and in October 2016, Defendants Lombardi, Young, Sampson and Jane/John Does 6-10 were fully aware of the Center's conditions and problems set forth in paragraphs 7 through 10 above.

12.     The State ignored the advice and concerns of the BBH staff member and Garceau's parole officer referred to in paragraphs 4 and 5 above, and, beginning on October 20, 2016, the State required Garceau to reside at the Center.

13.     Tragically, the State's decision to require Garceau to reside at the Center was, in effect, a death sentence for Garceau.

14.     Center personnel knew that Garceau was suffering from serious mental illnesses.

15.     Center personnel knew that Garceau was experiencing suicidal ideation.

16.     Center personnel knew that Garceau had a history of suicide attempts.

17.     Center personnel knew that Garceau had made a serious suicide attempt on October 9, 2016, less than two weeks before he was required by the State to stay at the Center.

18.     Center personnel knew that Garceau was particularly vulnerable to suicide.

19.     Center personnel knew that Garceau had been prescribed medications for his serious mental illnesses and suicidal ideation.

20.     Garceau was placed in a Center cell that had no lighting and was not designed or constructed to protect individuals who are particularly vulnerable to suicide.

21.     Garceau was placed in a Center cell that was not properly furnished to protect individuals who are particularly vulnerable to suicide.

22.     Garceau was placed in a Center cell with items that are dangerous for individuals who are particularly vulnerable to suicide.

23.     For the first three of the four days Garceau was in the custody of the State at the Center (i.e. October 20, 21 and 22, 2016), Garceau did not receive any of the medications that had been prescribed for him for his serious mental illnesses and suicidal ideation.

24.     While Garceau was in the custody of the State at the Center, Center personnel did nothing to protect Garceau from self-harm, including not putting Garceau on a suicide watch.

25.     While Garceau was in the custody of the State at the Center, Garceau did not receive any counseling for his serious mental illnesses.

26.     On October 23, 2016, Center personnel ignored and, by choosing not to perform their jobs, did not discover Garceau making the ligature he used to commit suicide.

27.     At approximately 7:40 p.m. on October 23, 2016, Garceau committed suicide and died in his cell at the Center, and his body was not discovered by Center personnel until approximately 9 hours later.

28.     Garceau's mental health deteriorated and Garceau died as a result of Defendants' conscious disregard for and deliberate indifference to Garceau's serious medical and mental health needs and right to be protected from self-harm, including the decisions and choices by Defendants Lombardi, Young, Sampson, and Jane/ John Does 6-10 to ignore and not correct the Center's long known and deplorable problems and conditions.

29.     The DOC investigated Garceau's suicide, and it concluded that, had Garceau been placed on close observation or a suicide watch, Garceau's death would have been prevented or less likely to occur.

## II.   PARTIES

### A. Plaintiffs

30.     Plaintiff Richard Shinners ("Shinners") is the Personal Representative of the Estate of David Alan Garceau, Deceased ("the Estate"). Shinners brings the claims made in this action pursuant to 42 U.S.C. § 1983 ("§ 1983") as the Estate's Personal Representative and the representative of Garceau's survivors, next of kin and heirs.

31.     Plaintiff Nathan Garceau ("N. Garceau") is Garceau's adult son. N. Garceau brings the State wrongful death and survival claims made in this action for himself and on behalf of Garceau's parents, Sharon Garceau and Alan Garceau.

### B. Defendants

32.     Defendant George Lombardi ("Lombardi") is a resident of Missouri who, at all relevant times, was the DOC's Director. Lombardi is a "person" under § 1983 who, at all relevant

times, acted in his capacity as the DOC's Director and under color of law. Lombardi is sued in his individual capacity.

33.   Defendant John Young ("Young") is a resident of Missouri who, at all relevant times, was the Center's Superintendent. Young is a "person" under §1983 who, at all relevant times, acted in his capacity as the Center's Superintendent and under color of law. Young is sued in his individual capacity.

34.   Defendant Joseph Sampson ("Sampson") is a resident of Missouri who, at all relevant times, was the Center's Assistant Superintendent. Sampson is a "person" under §1983 who, at all relevant times, acted in his capacity as the Center's Assistant Superintendent and under color of law. Sampson is sued in his individual capacity.

35.   Defendant Antonio Gray ("Gray") is a resident of Missouri who, at all relevant times, was an employee of the State and assigned to the Center. Gray is a "person" under §1983 who, at all relevant times, acted in his capacity as a Center employee and under color of law. Gray is sued in his individual capacity.

36.   Defendant Tasha Kupihea ("Kupihea") is a resident of Missouri who, at all relevant times, was an employee of the State and assigned to the Center. Kupihea is a "person" under §1983 who, at all relevant times, acted in her capacity as a Center employee and under color of law. Kupihea is sued in her individual capacity.

37.   Defendant LeRonald Loper ("Loper") is a resident of Missouri who, at all relevant times, was an employee of the State and assigned to the Center. Loper is a "person" under §1983 who, at all relevant times, acted in his capacity as a Center employee and under color of law. Loper is sued in his individual capacity.

38.     Defendant Freddie Holloway ("Holloway") is a resident of Missouri who, at all relevant times, was an employee of the State and assigned to the Center. Holloway is a "person" under §1983 who, at all relevant times, acted in his capacity as a Center employee and under color of law. Holloway is sued in his individual capacity.

39.     Defendant Samantha Stanfield ("Stanfield") is a resident of Missouri who, at all relevant times, was an employee of the State and assigned to the Center. Stanfield is a "person" under §1983 who, at all relevant times, acted in her capacity as a Center employee and under color of law. Stanfield is sued in her individual capacity.

40.     Defendants Jane/John Does 1-10, whose names are presently unknown and cannot be ascertained by due diligence, were at all relevant times residents of Missouri. Between October 20 and 23, 2016, inclusive, Defendants Does 1-10 were employees of the State and assigned to the Center.  Defendants Does 1-10 are "persons" under §1983 who, at all relevant times, acted in their capacities as Center employees and under color of law. Defendants Does 1-10 are sued in their individual capacities, and Plaintiff will seek leave to amend the Complaint to publish the names of Defendants John/Jane Does 1-10 when their names have been ascertained.

## III.    JURISDICTION, VENUE AND WAIVER OF SERVICE

41.     This Court has jurisdiction over the federal claims made in this action because they arise under the Eighth Amendment to the United States Constitution and are brought pursuant to §1983.

42.      The state claims made in this action are based on the same acts and omissions that give rise to the federal claims, and they are brought pursuant to Missouri state laws. As such, jurisdiction over the state claims is conferred by 28 U.S.C. §1367.

43.     This Court has personal jurisdiction over each Defendant, and venue is proper pursuant to 28 U.S.C. § 1391(b) because all acts and omissions that form the basis of the claims made in this action occurred in St. Louis, Missouri.

44.     Each named Defendant has agreed that the Office of the Attorney General of Missouri is authorized to waive service of summons on his or her behalf.

**IV.     STATEMENT OF FACTS RELEVANT TO AND IN SUPPORT OF ALL CLAIMS**

**A.     The Center's Duty To Provide Medical And Mental Health Care And Protection From Self Harm**

45.     Under the Eighth Amendment to the United States Constitution, an individual in custody at the Center with serious medical and/or mental health needs has the right to receive adequate treatment for those needs.

46.     Under the Eighth Amendment to the United States Constitution, an individual in custody at the Center for whom medications for his serious medical and/or mental health needs have been prescribed has the right to receive those medications in the dosages and at the times prescribed.

47.     Under the Eighth Amendment to the United States Constitution, an individual in custody at the Center with an obvious and particular vulnerability to suicide has the right to be protected from self-harm.

48.     In October 2016 the Constitutional rights referred to in paragraphs 45, 46 and 47 above were clearly established by the United States Supreme Court and the Eighth Circuit Court of Appeals.

**B.     David Alan Garceau**

49.     In October 2016 Garceau was a 41 year-old father, son and brother.

50.     In October 2016 Garceau was suffering from serious mental illnesses and suicidal ideation, and he had a history of suicide attempts.

51.     On October 9, 2016, Garceau attempted suicide by seriously cutting himself.

52.     In October 2016 Garceau was fully aware that he had a family support system, and Garceau's mother and sister made it known to Garceau and the State that, upon his release from the hospital after his October 9, 2016 suicide attempt, Garceau was welcome to reside with them in Ohio.

53.     At the time of his death, Garceau's family knew of his history of serious mental illnesses and suicide attempts. That knowledge did not in any way diminish the family's love for Garceau or their desire to help, support and protect him.

**C.     The Center In October 2016**

54.     For years prior to October 2016 the Center had been the subject of many complaints made to the State by leaders of the City of St. Louis.

55.     According to Kenneth Jones, Chairman of Missouri's BPP, by October 2016, the Center had been reduced to the equivalent of a homeless shelter.

56.     According to Ann Precythe, the current DOC Director, by October 2016, the Center had "been neglected for far too long."

57.     Defendant Stanfield stated that, in October 2016, the Center was a "wasteland" where residents "were treated like dirt."

58.     When he chose Ms. Precythe to replace Defendant Lombardi as the DOC's Director, Missouri Governor Eric R. Greitens stated that the DOC was broken and had a culture of harassment and neglect.

59.     For years prior to and in October 2016, the Center was experiencing the problems and conditions set forth in paragraphs 7 through 10 above.

60.     For years prior to and in October 2016, Defendants Lombardi, Jones, Young, Sampson and Jane/John Does 6-10 were fully aware of the problems and conditions set forth in paragraphs 7 through 10 above.

61.     For years prior to and in October 2016, the Center's supervisors were fully aware of the problems and conditions set forth in paragraphs 7 through 10 above.

62.     In October 2016 the Center's problems and conditions as set forth in paragraphs 7 through 10 above made it impossible for Garceau to receive the appropriate care and treatment that he needed for his serious mental health problems and to protect him from self-harm.

63.     The Center's problems and conditions set forth in paragraphs 7 through 10 above caused or contributed to the deterioration of Garceau's mental health.

64.     The problems and conditions set forth in paragraphs 7 through 10 above caused or contributed to Garceau's death.

**D.      Burrell Behavioral Health and Garceau's October 9, 2016 Suicide Attempt**

65.     On September 29, 2016, Garceau was brought to the BBH to be evaluated.

66.     During the BBH's screening process, Garceau disclosed that he had a history of serious mental illnesses, suicidal ideation and suicide attempts.

67.     During the BBH's screening process, Garceau also described himself as a "cutter."

68.     In late September or early October 2016, Garceau was found by the BBH staff to "meet the criteria for PTSD, schizoaffective disorder, depressed type [and that Garceau] would benefit from care and mood management."

69.     On October 9, 2016, Garceau attempted suicide by severely cutting himself, and he was transported by ambulance to a hospital.

70.     After Garceau's October 9, 2016 suicide attempt, Garceau's mother and sister informed the BBH's staff and Garceau's parole officer that they wanted Garceau to live with them in Ohio when he was released from the hospital.

71.     Upon his release from the hospital, Garceau was not permitted to reside with his mother or sister in Ohio because he was required by the State to stay in Missouri as a condition of his parole.

72.     On October 12, 2016, a BBH staff member spoke with Garceau's parole officer, who informed the BBH staff member that a homeless shelter or similar housing options were not good options for Garceau because it appeared that Garceau was a danger to himself and others.

73.     Garceau's parole officer was so concerned about Garceau's safety and health needs that she stated that she would do what was necessary, including violating Garceau's parole, to see that Garceau was placed in a facility where he would be provided the protection and medical and mental health treatment that he needed.

74.     On October 12, 2016, a BBH staff member spoke with a nurse who is a mental health professional, and that nurse informed the BBH staff member that Garceau's demeanor and voice "may indicate severe psychological issues."

75.     The nurse referred to in paragraph 74 above also informed the BBH staff member that Garceau "was severely depressed and may be a risk of harm to himself and others."

76.     Prior to October 20, 2016, an Ozark Medical Center social worker advised BBH that Garceau should be transferred to a residential facility "that will address his alcoholism and his mental health issues."

77.     The nurse's, the social worker's and the parole officer's advice (as set forth in paragraphs 72 through 76 above) was not followed, and Garceau was directed by the State to stay at the Center.

78.     The nurse's, the social worker's and the parole officer's concerns (as set forth in paragraphs 72 through 76 above) were ignored, and Garceau was directed by the State to stay at the Center.

79.     Garceau was required by the State to stay at the Center where he was held in the custody of the State.

80.     Garceau was required by the State to stay at the Center even though it was known by or obvious or should have been obvious to Defendants Lombardi, Young, Sampson and Jane/John Does 6-10 and Garceau's parole officer that Garceau's serious health needs, both mental and physical, would not be met and he would not be protected from self-harm while he was in custody at the Center.

### E.     Garceau's Mental Health Condition And The Medications He Had In His Possession When He Arrived At The Center

81.     When he arrived at the Center, Garceau was suffering from suicidal ideation and serious mental illnesses, including PTSD, schizoaffective disorder, and depression.

82.     When he arrived at the Center, Garceau was particularly vulnerable to suicide.

83.     When he arrived at the Center, Garceau was under a medication plan that had been established by medical professionals to treat his suicidal ideation and serious mental health problems and needs.

84.     When Garceau arrived at the Center, he had the following medications in his possession:

- Gabapentin 600 mg.
- Meloxicam 7.5 mg.
- Zolpidem 10 mg.
- Prazosin HCL 2 mg.
- Hydroxyzpam 50 mg.
- Clonazepam 1 mg.
- Doxepin HCL 25 mg.
- Sertraline 100 mg.

85.     Of the medications listed in paragraph 84 above, four of them had been prescribed for Garceau to treat his suicidal ideation and mental health problems and needs.

**F.      The Medications Prescribed For Garceau By Dr. Stephen Samolyk**

86.     On October 20, 2016 and prior to Garceau's admission to the Center, the State had Garceau examined by Dr. Stephen Samolyk at St. Alexius Hospital.

87.     After examining Garceau, Dr. Samolyk prescribed the following medications for him, along with instructions of how many times a day Mr. Garceau was to receive them:

- Clonazepam .05 mg., by mouth 2 times per day
- Gabapentin 300 mg., by mouth 3 times per day
- Lurasidone 40 mg., by mouth every evening with food
- Naltrexone 50 mg., by mouth every day
- Naproxen 500 mg., by mouth 2 times per day with food or milk
- Prazosin HCL 2 mg., by mouth once daily at bedtime
- Sertraline 100 mg., by mouth every day
- Trazodone 100 mg., by mouth every day at bedtime

88.     Of the medications listed in paragraph 87 above, four of them had been prescribed for Garceau to treat his suicidal ideation and mental health problems and needs, and four were in Garceau's possession when he arrived at the Center.

**G.      Garceau's Stay At The Center**

89.     Garceau was placed and required by the State to reside in a Center cell that was not designed or constructed to protect individuals who are particularly vulnerable to suicide.

90.     Garceau was placed and required by the State to reside in a Center cell that had no lighting and was not properly furnished to protect individuals who are particularly vulnerable to suicide.

91.     Garceau was placed and required by the State to reside in a Center cell that had items that are dangerous for individuals who are particularly vulnerable to suicide.

92.     While in the custody of the State at the Center from October 20, 2016 through some time on October 23, 2016, Garceau was not administered any of the medications that had been prescribed for him by Dr. Samolyk.

93.     While in the custody of the State at the Center from October 20, 2016 through some time on October 23, 2016, Garceau did not receive any counseling for his mental health problems and needs, including his suicidal ideation.

94.     While Garceau was in the custody of the State at the Center from October 20, 2016 through approximately 7:40 p.m. on October 23, 2016, Center personnel did nothing to protect Garceau from self-harm.

95.     At approximately 7:40 p.m. on October 23, 2016, Garceau committed suicide and died, and his body was not discovered for approximately 9 hours.

96.     The failure to provide Garceau with his prescribed medications and any counseling for his serious mental health needs while he was in custody at the Center caused or contributed to the deterioration of Garceau's mental health and his death.

97.     The failure to protect Garceau from self-harm while he was in custody at the Center caused or contributed to Garceau's death.

**H.     The State's And DOC's Investigation Of Garceau's Death**

98.     The State and DOC conducted an investigation of Garceau's death.

16

99.     As a result of their investigation of Garceau's death, the State and DOC found that, from the time that he arrived at the Center on October 20, 2016 until some time on October 23, 2016, Garceau was not administered any of the medications that had been prescribed for Garceau to treat his serious mental health needs.

100.    In connection with the investigation of Garceau's death, on March 14, 2017, State employee Samuel Billingsley exchanged emails with Julie Kempker, another State employee.

101.    Attached hereto as Exhibit "A" is a true and accurate copy of the emails exchanged between Mr. Billingsley and Ms. Kempker on March 14, 2017.

102.    In his 1:54 pm, March 14, 2017 email, Mr. Billingsley stated, in part, that:

> Offender Garceau was placed in (TASC) Administrative Segregation Unit upon been release from St. Alexius Hospital.  The Duty Officer should have been notified. Offender Garceau should have been placed on Close Observation or "Suicide Watch" by the Shift Commander, status in compliance with Departmental and Institutional policies and procedures.

103.    In the March 14, 2017 Email, Billingsley also stated, in part, that:

> Yes I think it [Garceau being placed on close observation or a suicide watch] would have…prevented or made Garceau's death less likely to occur.

104.    As a result of their investigation of Garceau's death, the State and DOC found that Defendants Gray, Kupihea, Loper and Stanfield had violated a number of DOC's policies and the Center's Post Orders.

## V.   CAUSES OF ACTION

### First Cause Of Action
### (§1983 Claim Against Defendant Gray)

105.    Plaintiffs incorporate paragraphs 1 through 104 as if fully rewritten herein

106.    On October 20, 2016, Defendant Gray handled the intake and screening process of Garceau at the Center.

107.     While completing Garceau's intake and screening process, Gray learned of the medications Garceau had in his possession that had been prescribed for Garceau's serious mental and medical health needs.

108.     While completing Garceau's intake and screening process, Gray took possession of the medications referenced in paragraph 107 above.

109.     While completing Garceau's intake and screening process, Gray learned of the medications that Dr. Samolyk had prescribed for Garceau's serious mental and medical health needs.

110.     While completing Garceau's intake and screening process, Defendant Gray learned that, in late September or early October 2016, the BBH staff found that Garceau met the criteria for PTSD, schizoaffective behavior and depression.

111.     While completing Garceau's intake and screening process, Gray learned of Garceau's history of suicide attempts.

112.     While completing Garceau's intake and screening process, Gray learned that Garceau was suffering from serious mental illnesses and was experiencing suicidal ideation.

113.     Knowing which medications that had been prescribed by Dr. Samolyk for Garceau's serious mental and medical health needs, Gray had a duty to take steps to ensure that those medications were administered to Garceau.

114.     Gray did not take the steps to ensure that Garceau was administered the medications that had been prescribed for Garceau's serious medical and mental health needs.

115.     The substantial risks of harm to Garceau by Gray's failure to take the steps to ensure that Garceau was administered the medications he had been prescribed for Garceau's serious

medical and mental health needs were known by or were obvious or should have been obvious to Gray.

116.    While in the State's custody at the Center from October 20, 2016 until some time on October 23, 2016, Garceau was not administered any of the medications that had been prescribed for him.

117.    Defendant Gray's acts and omissions as set forth above were reckless and constitute deliberate indifference to Garceau's serious medical and mental health needs.

118.    Defendant Gray acted with deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs.

119.    Defendant Gray's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for providing prescribed medication to prisoners with serious medical and mental health needs.

120.    Defendant Gray, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including his right to receive proper and adequate medical care for his serious medical and mental health needs.

121.    As a direct and proximate result of Defendant Gray's deliberately indifferent and reckless acts and omissions as set forth above, Garceau suffered severe emotional anguish and distress, and his mental health deteriorated.

**<u>Second Cause Of Action</u>**
**(§1983 Claim Against Defendant Gray)**

122.    Plaintiffs incorporate paragraphs 1 through 121 as if fully rewritten herein.

123.    While completing Garceau's intake and screening process, Defendant Gray learned of Garceau's October 9, 2016 suicide attempt.

124.    While completing Garceau's intake and screening process, the physical injuries from the cuts Garceau sustained while attempting suicide on October 9, 2016 were known by and clearly visible to Defendant Gray.

125.    While completing Garceau's intake and screening process, Defendant Gray learned that Garceau was suffering from serious mental illnesses.

126.    While completing Garceau's intake and screening process, Defendant Gray learned that, in late September or early October 2016, the BBH staff found that Garceau met the criteria for PTSD, schizoaffective behavior and depression.

127.    While completing Garceau's intake and screening process, Defendant Gray learned of Garceau's history of suicide attempts.

128.    While completing Garceau's intake and screening process, Gray learned that Garceau was experiencing suicidal ideation.

129.    One of Defendant Gray's duties in connection with Garceau's intake and screening process was to complete the Center's "Fitness For Confinement Survey – SCLR" ("the Survey").

130.    Defendant Gray failed to properly perform his duty to complete the Survey in several significant ways, including in the following ways found by the DOC investigators:

- #1    "Mental Health History" was marked "no" and should not have been as this was in conflict with subsequent questions.
- #2    "Psychotropic Drugs" was marked "yes" and no drugs were listed as required.
- #3    "Other Medications" was marked "no" when Garceau's property included eight prescription medications which were filled on 10/18/16 and were in his property at SLCRC.
- #4    "Suicide Attempts" was marked "yes" and none were listed for "when" as required.
- #7    "Illegal Drugs" was marked "yes" and none were listed as required.

131.    Another of Defendant Gray's duties in connection with Garceau's intake and screening process was to follow the Center's "Initial Assessment Phase And Supervision Of Clients With Mental Illness" procedures.

132.    Defendant Gray failed to properly perform his duty to follow the Center's procedures referred to in paragraph 131 above.

133.    With the information that Defendant Gray obtained during Garceau's intake and screening process, it was known by or it was obvious or should have been obvious to Defendant Gray that Garceau was particularly vulnerable to suicide.

134.    With the information that Defendant Gray obtained during Garceau's intake and screening process, it was known by or it was obvious or should have been obvious to Defendant Gray that a comprehensive suicide assessment of Garceau was needed.

135.    With the information that Defendant Gray obtained during Garceau's intake and screening process, it was known by or it was obvious or should have been obvious to Defendant Gray that Garceau should be placed on suicide watch

136.    With the information that Defendant Gray obtained during Garceau's intake and screening process, it was known by or it was obvious or should have been obvious to Defendant Gray that Garceau needed to be assigned to a cell appropriate for a person particularly vulnerable to suicide.

137.    With the information that Defendant Gray obtained during Garceau's intake and screening process, it was known by or it was obvious or should have been obvious to Defendant Gray that all items that Garceau could use to commit suicide should be taken from Garceau and removed from the cell to which he was assigned.

138.    Defendant Gray did not have a comprehensive suicide assessment of Garceau done.

139.    Defendant Gray did not place or have Garceau placed on a suicide watch.

140.    Defendant Gray did not assign or have Garceau assigned to a cell appropriate for a person particularly vulnerable to suicide.

141.    Defendant Gray did not take from Garceau or remove from Garceau's cell the items he could and did use to commit suicide.

142.    The substantial risks of harm to Garceau by Defendant Gray's acts and omissions as set forth above were known by or were obvious or should have been obvious to Defendant Gray.

143.    Defendant Gray's acts and omissions as set forth above were reckless and constitute deliberate indifference to Garceau's serious medical and mental health needs.

144.    Defendant Gray acted with deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs.

145.    Defendant Gray's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for identifying a prisoner's suicidal ideation and protecting a prisoner from self-harm.

146.    Defendant Gray, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including his right to be protected from self-harm.

147.    As a direct and proximate result of Defendant Gray's deliberately indifferent and reckless acts and omissions as set forth above, Garceau committed suicide and died.

148.    As a direct and proximate result of Defendant Gray's deliberately indifferent and reckless acts and omissions, Garceau's survivors, next of kin and/or heirs have suffered the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, and they have incurred funeral bills.

149.     As a direct and proximate result of Defendant Gray's deliberately indifferent and reckless acts and omissions, Garceau's survivors, next of kin and/or heirs have suffered severe grief, anguish and mental and emotional distress.

### Third Cause Of Action
### (§1983 Claim Against Defendant Kupihea)

150.     Plaintiffs incorporate paragraphs 1 through 149 as if fully rewritten herein.

151.     On October 20, 21, 22 and/or 23, 2016, Defendant Kupihea was assigned to work in the Ad Seg Unit of the Center where Garceau was being held in custody.

152.     Dr. Samolyk prescribed the eight medications set forth in paragraph 87 above, four of which Garceau needed for his serious medical and mental health needs.

153.     Defendant Kupihea knew of the medications that Dr. Samolyk had prescribed for Garceau.

154.     It was known by or it was obvious or should have been obvious to Defendant Kupihea that the medications that had been prescribed by Dr. Samolyk for Garceau were needed by Garceau for his serious medical and mental health needs.

155.     Defendant Kupihea's duties at the Center included delivering the medications to Garceau that had been prescribed by Dr. Samolyk for Garceau.

156.     On October 20, 21, 22 and/or 23, 2016, Defendant Kupihea did not deliver to Garceau the medications that had been prescribed by Dr. Samolyk for Garceau.

157.     On October 20, 21 and 22, Garceau did not receive the medications that had been prescribed by Dr. Samolyk for Garceau.

158.     The substantial risks of harm to Garceau by Defendant Kupihea's failure to deliver to Garceau the medications that had been prescribed by Dr. Samolyk for Garceau were known by or were obvious or should have been obvious to Defendant Kupihea.

159.     Defendant Kupihea's acts and omissions as set forth above were reckless and constitute deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs.

160.     Defendant Kupihea acted with deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs.

161.     Defendant Kupihea's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for administering prescribed medications to prisoners with serious medical and mental health needs.

162.     Defendant Kupihea, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including Garceau's right to receive proper and adequate medical care for his serious medical and mental health needs.

163.     As a direct and proximate result of Defendant Kupihea's deliberately indifferent and reckless acts and omissions as set forth above, Garceau suffered severe emotional anguish and distress, and his mental health deteriorated.

### Fourth Cause Of Action
### (§1983 Claim Against Defendant Kupihea)

164.     Plaintiffs incorporate paragraphs 1 through 163 as if fully rewritten herein.

165.     On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Kupihea that Garceau was particularly vulnerable to suicide and needed to be watched closely.

166.     On October 23, 2016, Defendant Kupihea's duties at the Center included making proper security checks on Garceau when they were scheduled.

167.   On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Kupihea that one of the reasons she was required to make proper security checks on Garceau when they were scheduled was to protect Garceau from self-harm.

168.   The substantial risks of serious harm to Garceau resulting from Defendant Kupihea's failure to make all of the security checks of Garceau in a proper manner and when they were scheduled were known by or were obvious or should have been obvious to Defendant Kupihea.

169.   Defendant Kupihea failed to make many, if not most, of the security checks of Garceau she was required to make on October 23, 2016.

170.   Had she fulfilled her duty to make proper security checks of Garceau when they were scheduled on October 23, 2016 Defendant Kupihea would have discovered that, beginning at approximately 2:00 p.m. on that day, Garceau was making and testing the ligature he used to commit suicide, and Defendant Kupihea would or should have prevented Garceau from committing suicide.

171.   On October 23, 2016, Defendant Kupihea spoke with Garceau.

172.   During his October 23, 2016 conversation with Defendant Kupihea, Garceau, who was a self-described "cutter," asked Defendant Kupihea if she would provide him with a razor.

173.   Despite knowing that Garceau had a history of suicide attempts that involved cutting and that he was particularly vulnerable to suicide, Defendant Kupihea did not report to her supervisors or medical professionals that Garceau had asked for a razor.

174.   It was known by or it was obvious or should have been obvious to Defendant Kupihea that Garceau's request for a razor was a clear indication that Garceau was or could have been seriously contemplating suicide.

175.    Had Defendant Kupihea communicated Garceau's request for a razor to her supervisor or medical personnel, Garceau would or should have been placed on a suicide watch.

176.    The substantial risks of harm to Garceau by her failure to do proper security checks when they were scheduled were known by or were obvious or should have been obvious to Defendant Kupihea.

177.    The substantial risks of harm to Garceau by her failure to communicate Garceau's request for a razor to her supervisors or medical personnel were known by or were obvious or should have been obvious to Defendant Kupihea.

178.    Defendant Kupihea's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for identifying a prisoner's suicidal ideation and protecting a prisoner from self-harm.

179.    Defendant Kupihea's acts and omissions as set forth above were reckless and constitute deliberate indifference and conscious disregard by Defendant Kupihea to Garceau's known serious medical and mental health needs.

180.    Defendant Kupihea's acts and omissions as set forth above were reckless and constitute deliberate indifference and conscious disregard by Defendant Kupihea to Garceau's known and obvious need to be protected from self-harm.

181.    Defendant Kupihea, under color of state law and with deliberate indifference and conscious disregard, deprived Garceau of his rights secured by the United States Constitution, including his right to be protected from self-harm.

182.    As a direct and proximate result of Defendant Kupihea's deliberately indifferent and reckless acts and omissions as set forth above, Garceau committed suicide and died.

183.     As a direct and proximate result of Defendant Kupihea's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs have suffered the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, and they have incurred funeral bills.

184.     As a direct and proximate result of Defendant Kupihea's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs have suffered severe grief, anguish and mental and emotional distress.

### Fifth Cause Of Action
**(§1983 Claim Against Defendant Loper)**

185.     Plaintiffs incorporate paragraphs 1 through 184 as if fully rewritten herein.

186.     Dr. Samolyk prescribed the eight medications set forth in paragraph 87 above that Garceau needed for his serious medical and mental health needs.

187.     Between October 20 and 23, 2016, Defendant Loper was assigned to work in the Ad Seg Unit of the Center where Garceau was being held in custody.

188.     Defendant Loper knew of the medications that had been prescribed by Dr. Samolyk for Garceau.

189.     It was known by or it was obvious or should have been obvious to Defendant Loper that the medications that had been prescribed by Dr. Samolyk for Garceau were needed by Garceau for his serious medical and menetal health needs.

190.     On October 20, 21, 22 and/or 23, 2016, Defendant Loper's duties at the Center included delivering the medications that had been prescribed by Dr. Samolyk for Garceau.

191.     On October 20, 21, 22 and/or 23, 2016, Defendant Loper did not deliver to Garceau the medications that had been prescribed by Dr. Samolyk for Garceau.

192.    On October 20, 21 and 22, 2016, Garceau did not receive any of the medications that had been prescribed by Dr. Samolyk for him.

193.    The substantial risks of harm to Garceau by Defendant Loper's failure to deliver to Garceau the medications that had been prescribed by Dr. Samolyk for Garceau were known by or were obvious or should have been obvious to Defendant Loper.

194.    Defendant Loper's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for providing prescribed medications to prisoners with serious medical and mental health needs.

195.    Defendant Loper's acts and omissions as set forth above were reckless and constitute deliberate indifference to Garceau's serious medical and mental health needs.

196.    Defendant Loper acted with deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs.

197.    Defendant Loper, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including Garceau's right to receive proper and adequate medical care for his serious medical and mental health needs.

198.    As a direct and proximate result of Defendant Loper's deliberately indifferent and reckless acts and omissions as set forth above, Garceau suffered severe emotional anguish and distress, and his mental health deteriorated.

### Sixth Cause Of Action
#### (§1983 Claim Against Defendant Loper)

199.    Plaintiffs incorporate paragraphs 1 through 198 as if fully rewritten herein.

200.    On October 23, 2016, it was known by Defendant Loper that Garceau was particularly vulnerable to suicide and needed to be watched closely.

201.    On October 23, 2016, Defendant Loper's duties included making proper security checks of Garceau when they were scheduled.

202.    On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Loper that one of the reasons he was to make proper security checks of Garceau when they were scheduled was to protect Garceau from self-harm.

203.    The substantial risks of serious harm to Garceau by Defendant Loper's failure to make all of the security checks of Garceau in a proper manner and when they were scheduled were known by or were obvious or should have been obvious to Defendant Loper.

204.    Defendant Loper failed to make many, if not most, of the security checks of Garceau he was required to make on October 23, 2016.

205.    Had he fulfilled his duty to make proper security checks of Garceau when they were scheduled on October 23, 2016 Defendant Loper would have discovered that, beginning at 2:00 p.m., Garceau was making and testing the ligature he used to commit suicide at approximately 7:40 p.m. that day, and Defendant Loper would or should have prevented Garceau from committing suicide.

206.    On October 23, 2016, Defendant Loper spoke with Garceau.

207.    During Garceau's October 23, 2016 conversation with Defendant Loper, Garceau, who was a self-described "cutter," asked Defendant Loper if he would provide him with a razor.

208.    It was known by or obvious or should have been obvious to Defendant Loper that Garceau's request for a razor was a clear indication that Garceau was or could have been seriously contemplating suicide.

209.    Despite knowing that Garceau had a history of suicide attempts that involved cutting and that he was a particularly vulnerable to suicide, Defendant Loper did not report to his supervisors or medical professionals that Garceau had asked for a razor.

210.    Had Defendant Loper communicated Garceau's request for a razor to his supervisors or medical professionals, Garceau would or should have been placed on a suicide watch.

211.    The substantial risks of harm to Garceau because of Defendant Loper's failure to report Garceau's request for a razor to his supervisor or medical professionals were known by or were obvious or should have been obvious to Defendant Loper.

212.    On October 23, 2016, Defendant Loper's duties included watching the video monitor of Garceau's cell, including between 2:00 p.m. and 4:00 p.m. on that day.

213.    On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Loper that one of the reasons he was required to watch the video monitor of Garceau's cell was to protect Garceau from self-harm.

214.    On October 23, 2016, Defendant Loper did not watch the video monitor of Garceau's cell for most, if not all, of her shift that day, including between 2:00 p.m. and 4:00 p.m. on that day.

215.    The substantial risks of harm to Garceau because Defendant Loper did not watch the video monitor of Garceau's cell were known by or were obvious or should have been obvious to Defendant Loper.

216.    Had he fulfilled his duty to watch the video monitor of Garceau's cell on October 23, 2016, Defendant Loper would have discovered that, for approximately two hours between 2

30

p.m. and 4 p.m. that day, Garceau was making and testing the ligature he used to commit suicide and Defendant Loper would or should have prevented Garceau from committing suicide.

217.    Defendant Loper's acts and omissions as set forth above were reckless and constitute deliberate indifference and conscious disregard by Defendant Loper to Garceau's serious medical and mental health needs.

218.    Defendant Loper's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for identifying a prisoner who is suicidal and needs protection from self-harm.

219.    Defendant Loper, under color of state law and with deliberate indifference and conscious disregard, deprived Garceau of his rights privileges and immunities secured by the United States Constitution, including his right to be protected from self-harm.

220.    As a direct and proximate result of Defendant Loper's deliberately indifferent and reckless acts and omissions as set forth above, Garceau committed suicide and died.

221.    As a direct and proximate result of Defendant Loper's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs have suffered the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, and they have incurred funeral bills.

222.    As a direct and proximate result of Defendant Loper's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs have suffered severe grief, anguish and mental and emotional distress.

<u>Seventh Cause Of Action</u>
**(§1983 Claim Against Defendant Holloway)**

223.    Plaintiffs incorporate paragraphs 1 through 222 as if fully rewritten herein.

224.    On October 20, 21, 22 and/or 23, 2016, one of Defendant Holloway's duties was to supervise the Center's employees whose duties included providing prescribed medications to individuals in custody at the Center in accordance with the regimen established for those individuals.

225.    In October 2016 Defendant Holloway knew or should have known of the obvious problem at the Center of the pervasive failure by Center personnel to dispense prescribed medications to individuals in custody at the Center in accordance with the regimen established for those individuals.

226.    The substantial risks of harm to individuals in custody at the Center who did not receive their prescribed medications in accordance with the regimen established for those individuals were known by or were obvious or should have been obvious to Defendant Holloway.

227.    On October 20, 21, and 22, 2016, Defendant Holloway did not perform his supervisory duty referred to in paragraph 224 above to supervise the Center's employees.

228.    While at the Center from October 20, 21 and 22, 2016, Garceau was not provided any of the medications that had been prescribed for him by Dr. Samolyk for his serious mental and medical health needs.

229.    Defendant Holloway's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for providing prescribed medications to prisoners with serious medical and mental health needs.

230.    Defendant Holloway's acts and omissions as set forth above were reckless and constitute deliberate indifference to Garceau's serious medical and mental health needs.

231.    Defendant Holloway acted with deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs.

232.    Defendant Holloway, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including his right to receive proper and adequate care for his serious medical and mental health needs.

233.    As a direct and proximate result of Defendant Holloway's deliberately indifferent and reckless acts and omissions as set forth above, Garceau suffered severe emotional anguish and distress, and his mental health deteriorated.

**Eighth Cause Of Action**
**(§1983 Claim Against Defendant Holloway)**

234.    Plaintiffs incorporate paragraphs 1 through 233 as if fully rewritten herein

235.    On October 23, 2016, it was known by Defendant Holloway that Garceau was particularly vulnerable to suicide and needed to be watched closely.

236.    On October 23, 2016, Defendant Holloway's duties included accurately completing the Chronological Log ("the Chron Log") for the Ad Seg Unit of the Center where Garceau was being held in custody.

237.    One of the reasons the Chron Log is used at the Center is to confirm that the security checks of the cells in the Ad Seg Unit that were required to be done by the Center's staff had, in fact, been done properly and when they were scheduled.

238.    On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Holloway that one of the reasons he was required to confirm that security checks on Garceau had been done in a proper manner and when they were scheduled was to protect Garceau from self-harm.

239.    On the October 23, 2016 Chron Log, Holloway wrote that the "usual inspection" of the cells had been done and "all [were] secure at 2:00, 2:30, 3:30 and 4:00 p.m."

240.    None of the October 23, 2016 2:00, 2:30, 3:30 and 4:00 p.m. inspections referred to in paragraph 239 were done.

241.    The substantial risks of serious harm to Garceau resulting from Defendant Holloway's failure to confirm that security checks of Garceau had been done in a proper manner and when they were scheduled were known by or were obvious or should have been obvious to Defendant Holloway.

242.    On October 23, 2016, had Defendant Holloway performed his duty referred to in paragraph 236 above, he would have discovered that most of the required security checks of Garceau had not been done, and he would or should have ordered that security checks after 4:00 p.m. on that day be completed in a proper manner and when they were scheduled.

243.    Had Defendant Holloway performed his duty referred to in paragraph 236 above, the ligature Garceau used to commit suicide would have been found before Garceau committed suicide at approximately 7:40 p.m. on October 23, 2016 and Garceau would have been prevented from committing suicide.

244.    On October 23, 2016, Defendant Holloway's duties also included watching the video monitor of Garceau's cell, including between 2:00 p.m. and 4:00 p.m. on that day.

245.    On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Holloway that one of the reasons he was required to watch the video monitor of Garceau's cell was to protect Garceau from self-harm.

246.    While on duty on October 23, 2016, Defendant Holloway used his cell phone and/or a Center computer for personal reasons for almost 2.5 hours.

34

247.    The substantial risks of harm to Garceau resulting from Defendant Holloway's decision not to watch the video monitor of Garceau's cell were known by or were obvious or should have been obvious to Defendant Holloway.

248.    Had he fulfilled his duty to watch the video monitor of Garceau's cell on October 23, 2016, Defendant Holloway would have discovered that Garceau was making and testing the ligature he used to commit suicide at approximately 7:40 p.m. that day, and Defendant Holloway would or should have prevented Garceau from committing suicide.

249.    Defendant Holloway's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for identifying a prisoner who is suicidal and needs protection from self-harm.

250.    Defendant Holloway's acts and omissions as set forth above were reckless and constitute deliberate indifference and conscious disregard by Defendant Holloway to Garceau's serious medical and mental health needs, including his right to be protected from self-harm.

251.    Defendant Holloway acted with deliberate indifference to and reckless disregard for Garceau's serious medical and mental health needs.

252.    Defendant Holloway, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including his right to receive proper and adequate medical care for his serious medical and mental health needs.

253.    As a direct and proximate result of Defendant Holloway's deliberately indifferent and reckless acts and omissions as set forth above, Garceau committed suicide and died.

254.    As a direct and proximate result of Defendant Holloway's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs

35

have suffered the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, and they have incurred funeral bills.

255.     As a direct and proximate result of Defendant Holloway's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs have suffered severe grief, anguish and mental and emotional distress.

### Ninth Cause Of Action
### (§1983 Claim Against Defendant Stanfield)

256.     Plaintiffs incorporate paragraphs 1 through 255 as if fully rewritten herein.

257.     On October 23, 2016, it was known by Defendant Stanfield that Garceau was particularly vulnerable to suicide and needed to be watched closely.

258.     On October 23, 2016, Defendant Stanfield's duties included making proper security checks on Garceau when they were scheduled.

259.     On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Stanfield that one of the reasons she was to make proper security checks of Garceau when they were scheduled was to protect Garceau from self-harm.

260.     The substantial risks of harm to Garceau by Defendant Stanfield's decision not to make the security checks of Garceau in a proper manner and when they were scheduled were known by or were obvious or should have been obvious to Defendant Stanfield.

261.     On October 23, 2016, Defendant Stanfield wrote in the Chron Log that, between 4:00 and 7:30 p.m. on that day, she had made 7 security checks of Garceau.

262.     On October 23, 2016, Defendant Stanfield actually made 2 security checks, and only one of those was conducted before 8:00 p.m.

263.    One of the security checks that Defendant Stanfield claimed to have made on October 23, 2016 was at 7:30 p.m., the time when Garceau was in the process of committing suicide.

264.    Defendant Stanfield did not make a security check of Garceau at 7:30 p.m. on October 23, 2016.

265.    Had she fulfilled her duty to make security checks of Garceau when scheduled and in a proper manner on October 23, 2016, Defendant Stanfield would have discovered that, beginning at 2:00 p.m. on that day, Garceau was making and testing the ligature he used that day to commit suicide, and she would have or should have prevented Garceau from committing suicide.

266.    Had she made the 7:30 security check she was required to make on October 23, 2016, Defendant Stanfield would have discovered Garceau in the process of attempting suicide, and she would or should have prevented Garceau from committing suicide.

267.    On October 23, 2016, Defendant Stanfield's duties included watching the video monitor of Garceau's cell, including between 2:00 p.m. and 4:00 p.m. on that day.

268.    On October 23, 2016, it was known by or it was obvious or should have been obvious to Defendant Stanfield that one of the reasons she was required to watch the video monitor of Garceau's cell was to protect Garceau from self-harm.

269.    While on duty on October 23, 2016, Defendant Stanfield used a Center computer and her cell phone for personal reasons for almost 5 hours.

270.    The substantial risks of harm to Garceau resulting from Defendant Stanfield's decision not to watch the video monitor of Garceau's cell were known by or were obvious or should have been obvious to Defendant Stanfield.

271.     Defendant Stanfield's acts and omissions as set forth above constitute a substantial departure from accepted correctional standards for identifying a prisoner who is suicidal and needs protection from self-harm.

272.     Had she fulfilled her duty to watch the video monitor of Garceau's cell, Defendant Stanfield would have discovered that Garceau was making and testing the ligature he used to commit suicide, and she would or should have prevented Garceau from committing suicide.

273.     Defendant Stanfield's acts and omissions as set forth above were reckless and constitute deliberate indifference by Defendant Stanfield to Garceau's serious medical and mental health needs.

274.     Defendant Stanfield acted with deliberate indifference to and conscious disregard for Garceau's right and need to be protected from self-harm.

275.     Defendant Stanfield, under color of state law and with deliberate indifference and conscious disregard, deprived Garceau of his rights secured by the United States Constitution, including his right to be protected from self-harm.

276.     As a direct and proximate result of Defendant Stanfield's deliberately indifferent and reckless acts and omissions as set forth above, Garceau committed suicide and died.

277.     As a direct and proximate result of Defendant Stanfield's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs have suffered the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, and they have incurred funeral bills.

278.    As a direct and proximate result of Defendant Stanfield's deliberately indifferent and reckless acts and omissions as set forth above, Garceau's survivors, next of kin and/or heirs have suffered severe grief, anguish and mental and emotional distress.

**Tenth Cause Of Action**
**(§1983 Claim Against Defendants Lombardi, Jones,**
**Young, Sampson And John/Jane Does 6-10)**

279.    Plaintiffs incorporate paragraphs 1 through 278 as if fully rewritten herein.

280.    For years prior to and in October 2016, the Center had many long existing, serious problems and deplorable conditions.

281.    The problems and conditions referred to in paragraph 280 above included those identified and listed in paragraphs 7 through 10 above.

282.    Despite being fully aware of the Center's problems and conditions referred to above, Defendants Lombardi, Jones, Young, Sampson and Jane/John Does 6-10 did nothing or virtually nothing to correct them.

283.    The substantial risks of harm to individuals housed at the Center by these Defendants' decision not to correct the Center's problems and conditions referred to above were known by or were obvious or should have been obvious to Defendants Lombardi, Jones, Young, Sampson and Jane/John Does 6-10.

284.    The substantial risks of harm to individuals housed at the Center who suffered from serious mental health and medical problems by these Defendants' decision not to correct the Center's problems and conditions referred to above were known by or were obvious or should have been obvious to these Defendants.

285.    These Defendants' decision not to correct the Center's problems and conditions referred to above constitutes a substantial departure from accepted correctional standards for

providing medical and mental health care to individuals in custody at the Center with serious medical and mental health needs.

286.    These Defendants' failure to correct the Center's problems and conditions referred to above was reckless and deliberately indifferent to Garceau's serious medical and mental health needs.

287.    By their decision not to correct the Center's problems and conditions referred to above, these Defendants acted with deliberate indifference to and conscious disregard for the serious medical and mental health needs of individuals in custody at the Center, including Garceau.

288.    By their decision not to correct the Center's problems and conditions referred to above, these Defendants, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including Garceau's right to receive proper and adequate care for his serious medical and mental health problems and needs.

289.    As a direct and proximate result of these Defendant's deliberately indifferent and reckless decision not to correct the Center's problems and conditions referred to above, Garceau suffered severe emotional anguish and distress and his mental health deteriorated.

## Eleventh Cause Of Action
### (§1983 Claim Against Defendants Lombardi, Jones, Young, Sampson And Jane/John Does 6-10)

290.    Plaintiffs incorporate paragraphs 1 through 289 as if fully rewritten herein.

291.    For years prior to and in October 2016, the Center had many long existing, serious problems and deplorable conditions.

292.    The problems and conditions referred to in paragraph 291 above included those identified and listed in paragraphs 7 through 10, above.

293.   Despite being fully aware of the problems and conditions referred to above, Defendants Lombardi, Jones, Young, Sampson and Jane/John Does 6-10 did nothing or virtually nothing to correct them.

294.   The substantial risks of harm to individuals housed at the Center by these Defendants' decision not to correct the Center's problems and conditions referred to above were known by or were obvious or should have been obvious to these Defendants.

295.   The substantial risks of harm to individuals housed at the Center who were particularly vulnerable to suicide by theses Defendants' decision not to correct the Center's problems and conditions referred to above were known by or were obvious or should have been obvious to these Defendants.

296.   These Defendants' decision not to correct the Center's problems and conditions constitutes a substantial departure from accepted correctional standards for identifying and protecting an individuals in custody at the Center who are particularly vulnerable to suicide.

297.   These Defendants' decision not to correct the Center's problems and conditions was reckless and constitutes deliberate indifference to the serious medical and mental health needs of individuals in custody at the Center, including their need to be protected from self-harm.

298.   These Defendants' decision not to correct the Center's problems and conditions was reckless and constitutes deliberate indifference to Garceau's serious medical and mental health needs, including his need to be protected from self-harm.

299.   By their decision not to correct the Center's problems and conditions, these Defendants acted with deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs, including his need to be protected from self-harm.

300.    By their decision not to correct the Center's problems and conditions, these Defendants, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including his right to receive proper and adequate care for his serious medical and mental health needs and to be protected from self-harm.

301.    As a direct and proximate result of these Defendants' deliberately indifferent and reckless decision not to correct the Center's problems and conditions, Garceau suffered severe emotional anguish and distress, and his mental health deteriorated.

302.    As a direct and proximate result of these Defendants' deliberately indifferent and reckless decision not to correct the Center's problems and conditions, Garceau committed suicide and died.

303.    As a direct and proximate result of these Defendants' deliberately indifferent and reckless decision not to correct the Center's problems and conditions, Garceau's survivors, next of kin and/or heirs have suffered the loss of his support, services, society, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, and they have incurred funeral bills.

304.    As a direct and proximate result of these Defendants' deliberately indifferent and reckless decision not to correct the Center's problems and conditions, Garceau's survivors, next of kin and/or heirs have suffered severe grief, anguish and mental and emotional distress.

### Twelfth Cause Of Action
### (§1983 Claim Against Defendants Jane/John Does 1-5)

305.    Plaintiffs incorporate paragraphs 1 through 304 as if fully rewritten herein.

306.    Dr. Samolyk prescribed the eight medications set forth in paragraph 87 above that Garceau needed for his serious medical and mental health needs.

307.    Defendants Jane/John Does 1-5 knew of the medications that Dr. Samolyk had prescribed for Garceau.

308.    It was known by or it was obvious or should have been obvious to Defendants Jane/John Does 1-5 that the medications that Dr. Samolyk had prescribed for Garceau were needed by Garceau for his serious medical and mental health needs.

309.    On October 20, 21, 22 and 23, 2016, Defendants Jane/John Does 1-5's duties at the Center included delivering the medications that Dr. Samolyk had prescribed for Garceau.

310.    On October 20, 21, 22 and/or 23, 2016, Defendants Jane/John Does 1-5 did not deliver to Garceau the medications that Dr. Samolyk had prescribed for him.

311.    On October 20, 21, and 22, 2016, Garceau did not receive any of the medications that Dr. Samolyk prescribed for him.

312.    The substantial risks of harm to Garceau by these Defendants' failure to deliver to Garceau the medications that had been prescribed for Garceau were known by or were obvious or should have been obvious to Defendants Jane/John Does 1-5.

313.    The acts and omissions of Defendants Jane/John Does 1-5 as set forth above constitute a substantial departure from accepted correctional standards for providing prescribed medication to prisoners with serious medical and mental health needs.

314.    Defendants Jane/John Does 1-5's acts and omissions as set forth above were reckless and constitute deliberate indifference to Garceau's serious medical and mental health needs.

315.    Defendants Jane/John Does 1-5 acted with deliberate indifference to and conscious disregard for Garceau's serious medical and mental health needs.

316.    By their acts and omissions, Defendants Jane/John Does 1-5, under color of law and with deliberate indifference and conscious disregard, violated Garceau's rights guaranteed by the United States Constitution, including his right to receive proper and adequate care for his serious medical and mental health needs.

317.    As a direct and proximate result of these Defendants' deliberately indifferent and reckless acts and omissions as set forth above, Garceau suffered severe emotional anguish and distress, and his mental health deteriorated.

### Thirteenth Cause Of Action
**(Wrongful Death Claim Against All Defendants)**

318.    Plaintiffs incorporate paragraphs 1 through 317 as if fully rewritten herein.

319.    Plaintiff N. Garceau, for and on behalf of himself and Garceau's parents, Sharon Garceau and Alan Garceau, brings this wrongful death claim pursuant to Missouri Law, §537.080 RSMo, 2016.

320.    This Cause of Action arises out of the same acts and omissions that give rise to the federal claims brought in this action.

321.    At all relevant times Defendants were employed by the State and acted within the scope of that employment.

322.    Defendants' acts and omissions as set forth in this Complaint were negligent, reckless, and/or wanton and willful, and they were done in bad faith and with malice.

323.    As set forth above, Defendants were derelict by their failure to fulfill their respective ministerial duties with respect to the Center and/or Garceau.

324.    As a direct and proximate result of Defendants' negligent, reckless, wanton, willful, malicious and bad faith acts and omissions, Garceau experienced severe and conscious pain and suffering, and his mental health deteriorated.

325.     As a direct and proximate result of Defendants' negligent, reckless, wanton, willful, malicious and bad faith acts and omissions, Garceau committed suicide and died.

326.     As a direct and proximate result of Defendants' negligent, reckless, wanton, willful, malicious and bad faith acts and omissions, Garceau's above-referenced survivors have suffered the damage and loss recoverable under §537.090 RSMo, 2016, including, but not limited to, the loss of his support, services, consortium, companionship, comfort, guidance, counsel, instruction, and training, and they have incurred funeral bills and pecuniary and related expenses.

### Fourteenth Cause Of Action
### (Survival Claim Against All Defendants)

327.     Plaintiffs incorporate paragraphs 1 through 326 as if fully rewritten herein.

328.     Plaintiff N. Garceau brings this survival claim pursuant to Missouri Law, §537.080 RSMo and §537.090 RSMo.

329.     This Cause of Action arises out of the same acts and omissions that give rise to the federal claims brought in this action.

330.     As a direct and proximate result of Defendants' negligent, reckless, wanton, willful, malicious and bad faith acts and omissions, Garceau experienced severe and conscious pain and suffering, and his mental health deteriorated.

331.     Defendants are liable to Plaintiff for the severe and conscious pain, suffering and mental health deterioration Garceau endured as a result of Defendants' negligent, reckless, wanton, willful and bad faith conduct.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor in the following form:

1.      compensatory damages against all Defendants in an amount to be determined at trial;
2.      punitive damages against all Defendants in an amount to be determined at trial;
3.      Plaintiffs' costs and reasonable attorneys' fees incurred in this action;
4.      prejudgment interest;
5.      all other relief to which Plaintiffs are entitled; and
6.      all other relief as this Court deems just and proper.

Respectfully submitted,

*/s Brian E. Hurley*
Brian E. Hurley (0007827OH)
Todd M. Powers (0027122OH)
Lawrence E. Barbiere (0027106OH)
**SCHROEDER, MAUNDRELL, BARBIERE & POWERS**
5300 Socialville-Foster Road, Suite 200
Mason, Ohio 45040
Tel. 513-583-4200, Fax 513-583-4203
bhurley@smbplaw.com

*/s Kenneth Knabe*
Kenneth J. Knabe (0017651OH)
**KNABE LAW FIRM CO., LPA**
14222 Madison Ave
Lakewood, OH 44107
Tel. 216-228-7207, Fax 216-228-7207
ken@klfohio.com

*/s Richard Shinners*
Richard Shinners (0026486MO)
**HAMMOND AND SHINNERS, PC**
13205 Manchester Rd., Ste. 210
St. Louis, MO 63131
Phone: 314-727-1015
Fax: 314-727-6804
mschallom@hammondshinners.com
***Attorneys For The Estate Of David Garceau, Deceased***

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

*/s Brian E. Hurley*
Brian E. Hurley (OH #0007827)

46